Good morning, ladies and gentlemen. We have a full courtroom and a full calendar. And so we will proceed to hear the cases in the order that they are listed. The first case is the people of California v. Reliant Energy et al. Good morning. May it please the Court, my name is Nora Cregan, and I represent Reliant Energy in this matter as well as in the other matters that the Court will be taking up this morning. Because of the complexities of the appeals and cross appeals in this case and the fact that other than Duke and Reliant, no one is really exactly aligned with one another, the parties made an agreement about how we would split up the time, and it doesn't fit exactly with the usual way. I will be speaking for seven minutes, and then Mr. Kleinman, who represents Duke, will be speaking for three. And then Mr. Smith will argue on behalf of both BC Hydro and PowerX for ten minutes. So that will take us to the first 20, rather. And we've talked this over with the courtroom deputy, and she just asked whether, she said we might suggest to you whether we should restart the clock or not with each person. But we can do it just on the 20s if you prefer. I think we can. Okay. And we will not interrupt anybody in the middle of a one-syllable word. We'll be a little lenient with it. Thank you. Because the time is so limited, we've split the issues as much as possible, and I will be discussing just BC Hydro and whether BC Hydro was entitled to sovereign immunity here. And I'd like to focus just on the test that the district court applied in making its determination that BC Hydro was entitled to sovereign immunity. And also because the court is hearing three related cases today, we realize that you're very familiar with all of the background. I do want to address one preliminary issue that the plaintiffs spent a lot of time talking about in their briefs, which is that the delay in this case has really disadvantaged the consumers of California because of the stay that this court put in place pending the appeal. And we just want to say that while this appeal was pending, a number of other things have happened that will actually help determine the outcome of the underlying issues in these cases. First, just a few weeks after the district court's remand decision here, Judge Whaley dismissed the complaint of Snohomish, which you'll be hearing later today. And that complaint is substantially similar to the complaint here, except it's on behalf of a different plaintiff. A few months later, Judge Walker dismissed most of the attorney general's cases, which, again, you'll be hearing today, some of which were heard last August. And this past summer, Judge Whaley dismissed a set of cases that are not before the court today that are still in the process of being briefed. And those were cases that were substantially similar, again, to this case and where the plaintiff was a purported class of California consumers. And, of course, at the same time, FERC has been continuing its work on the refund proceedings and has launched many investigations and concluded some of them. So all of this has been going on at the same time that this particular case has been stayed so that the underlying issues have come to the court and made their way to the court just as they would otherwise have. Turning to the BC Hydro issues, I'd like to focus just on the standards that the court applied. But I'm not quite sure I understand. Have there been stays entered in those appeals as well? No, none. So it's only this one? Just in this case, I should have been more clear. In this case, the remand order was stayed so that this appeal could go forward. The other cases have been making their way through the courts in the normal process, and many of them have are – a couple of them are before the court today. Some have already been argued to other panels. And the one set of class actions is in the process of being briefed. Okay. Thank you. So I think there are really two areas where we and BC Hydro part company on the court's decision. The first is that BC Hydro's commercial activities did have a direct effect in the United States, and the second was that under a properly applied agency test, BC Hydro is responsible for the activities of PowerX in the United States. And BC Hydro advocated for a much higher standard of identity of interest between itself and PowerX than the Supreme Court authorities dictate. So I want to focus mostly on the direct effects test, which is really – and the reason for that is that the district court really didn't apply the direct effects test at all in its decision. It focused on the activities of BC Hydro in British Columbia that are not the subject of this lawsuit and talked about how some of those activities are sovereign. And it emphasized that BC Hydro doesn't sell Power into the California market. Those are not the activities that we intended for the court to review as part of the direct effects test. The court also said that there was no linkage between BC Hydro's generation activities in Canada and PowerX's activities in California. Counsel, doesn't your argument boil down to your dispute over the district court's focus upon the setting of credit limits and that sort of thing by BC Power or BC Hydro of PowerX? Isn't that the heart of your direct effects argument? Yes, I think it is, Your Honor. And the reason that it's so important that you point that out is because that is the issue that the district court really didn't address at all when it went through the direct effects test. Well, if that's the heart of your case, then how do you distinguish our prior decisions? I'm thinking particularly of Judge Trott's decision in BankEC where the issue was with regard to the exchange rate and the refusal by the Peruvian government to approve some sort of a refund action. How do you distinguish that case and why shouldn't we apply it here? I think that the difference between that case and this is that BC Hydro was specifically addressing whether or not PowerX, whether or not it would supply power and whether PowerX could sell power into the California market. PowerX was not an intervening actor in that decision. PowerX was just doing – But doesn't PowerX purchase its power at the border from BC Hydro and then it markets it to, I guess, it would probably have to be other wholesalers in the United States unless it would find other wholesalers in Canada. It does both, Your Honor. All right. But the point that I was trying to make was that BC Hydro is making the decision to shut off the power to California. PowerX is not making any independent decision there. Well, BC Hydro decides whether or not it has sufficient excess capacity to sell to PowerX, doesn't it? It doesn't sell if it's using up everything it's generating for its Canadian customers. That's true. But BC Hydro was also specifically making power supply decisions in order to take advantage of the situation in the California market, and there's quite a bit of evidence in the record really referring to that. Is the evidence sufficient that the only purpose of the credit limits were to govern California sales or was this just a general credit limit that they applied to all of PowerX's activities? At a certain point in the middle of the crisis, BC Hydro made specific decisions about California credit. Actually, they raised it so that they could sell to California, didn't they? Well, they set it to zero at some point, and then after California requested that BC Hydro free up credit, then they did raise it back up again. And as a result of that, they made the highest revenues of any of the market participants. I've already gone a minute over my time. You have. Thank you. Good morning. May it please the Court, I'm Joel Kleinman. I'm counsel for Duke, and in the little over two minutes that I have remaining, I wanted to address why it is that neither the Bonneville Power Authority nor WAPA, the Western Area Power Administration, is the beneficiary in this instance of federal sovereign immunity. Judge Whaley correctly read the relevant section of the ISO Tariff, Section 20.7, to explicitly render those two entities subject to process issued from a California state court. And I would venture to say that if Section 20.7 was in the authorizing statute of one or both of those entities, we would not be here asking the question whether there was a waiver of sovereign immunity, because 20.7 is very clear on that question. Our proposition for why foreign federal sovereign immunity has been waived in this instance is that the waiver is inherent in what Congress authorized the administrators of these two agencies to do, namely to contract on terms that those agencies believed were necessary to the performance of their mission, and to resolve disputes arising out of those contractual arrangements also on terms that they thought were necessary. Now, the statutes are broad. In the instance of Bonneville, the administrator is authorized to enter into contracts or arrangements, including cancellation and compromise or final settlement of any claim arising thereunder. The arising thereunder, we contend, arises out of the obligations that Bonneville and WAPA undertook in the California market. The administrators of each of those agencies believed it necessary that they subscribe to the ISO and PX tariffs. Congress told them that they could accept the obligations, but they did not. And each of them believed that it was necessary to participate in those markets according to those markets' terms, and that's why they accepted them. By accepting them, if they acted improperly in those organized ISO and PX markets, they were creating for themselves potential liabilities in the way any contracting entity. So your argument is that a federal agency has the right to contract away sovereign immunity in the absence of an express authorization from Congress to do so? Our proposition is that these agencies have the express authorization. Where? What statute? Other than the fact that the statute enables the administrator to run the agency, tell me where in the statute Congress has said we are expressly waiving sovereign immunity. When Congress told the BPA administrator that he could resolve or compromise claims in a fashion that he believed appropriate, as Bonneville and its counsel, the Department of Justice, argued in the Court of Claims in Tenasca, they said that the statute authorizes binding arbitration. The fact that the administrator has the authority to enter into some sort of an alternative dispute resolution mechanism doesn't address the question of sovereign immunity, does it? We believe, Your Honor, it does. I see that my time is up, and I'm beginning to intrude on the time of the Canadian. I understand your answer. Thank you. Good morning. May it please the Court, my name is Gary Smith, and I'm here on behalf of PowerX and BC Hydro. And I'd like to address myself first to PowerX. PowerX is not claiming immunity in this case. PowerX is here seeking to secure its right to a trial before a federal judge in this action. PowerX believes it's entitled to that because it is a sovereign instrumentality of the Province of British Columbia. It is implementing the policy for which it was created. It was created to be the single window agency to market the export of the Province's hydropower resources in the United States and in other provinces of Canada, and that is what it does. It participates in commercial markets in order to do that, but that was its mission from the Province, and that's how it serves that mission. We believe that the district court did not give adequate weight to the facts of the creation of PowerX, did not fully weight the public purpose that PowerX serves, and that in looking for a day-to-day control to determine whether PowerX was an organ of the Province, it applied the wrong test and applied a test that if actually applied would make every organ an agent of its sovereign and thereby render every sovereign subject to jurisdiction in every case. In making those rulings, isn't the district court, among other things, saying that the case was not properly removed by PowerX? That was the ultimate conclusion. Can we review what you're asking us to review if that was a decision that the judge made in order to determine that PowerX had no right of removal? Yes. Under this court's precedence in Busey, the removal remains before this court. The court retains jurisdiction over the removal order until it is certified and sent to the state court. Oh, but aside from that argument, you might not have. In addition, it is a final order because it is dispositive of the issue of whether PowerX will receive a federal court trial because once this case goes back to state court, if it does, then PowerX has no vehicle by which to then raise with the state court. That's always true when a federal court decides that it has no removal jurisdiction and sends it back to the state court. The people who wanted to stay in federal court are out of luck as far as an appeal goes. They're just gone. They're back in state court. That's true. But in the Waco case in the Supreme Court, the court looked at the substantive decision that was made and then held that it had no jurisdiction to interfere with the remand. But here we have the opportunity to stop the remand because it hasn't gone forward. We're not interfering with the proceedings in state court, which is what the 1447D is supposed to enforce. Nothing is going on in state court, and it won't be interfered with by a review and a reversal so that Judge Whaley will once again have an opportunity to have this case before him to decide on the merits, whether there's any claim against PowerX. If I may turn to B.C. Hydro for a moment. Before I leave PowerX, one more point, and that is that the EIE Guam case that this court decided last year had not been decided at the time Judge Whaley made his ruling, and I believe that that case would have changed the ruling of the district court and that its application here would show that PowerX meets all of this court's tests for an organ of a sovereign state. As far as B.C. Hydro is concerned, the issue here, as presented by counsel, is the direct effects of B.C. Hydro's application of credit limits and, I submit, the generation of power, such that it had surplus power available to be sold by PowerX in other markets. Both of those, in our view, are sovereign functions. Part of what the province did in creating B.C. Hydro and later PowerX was give to B.C. Hydro sovereign control over the resources that it assigned to B.C. Hydro to develop. And so in the generation of that power and in the management of that power, it is fulfilling the sovereign function for which it was created. In applying credit limits, as it did in this instance, it is simply regulating the export of that power. Like this court's decision in M.O.L., this is B.C. Hydro setting limits on a policy-level basis, not on a transaction-by-transaction, here's a deal, what are we going to do? On a policy-level, setting credit limits by party using objective factors to say, we will not allow PowerX to make sales of our natural resources if we're not assured of payment. That is, we submit at bottom what that is, and that is a sovereign decision regulating the export of natural resources of the province. The capacity issue, the other element of it is delivering power. B.C. Hydro did have power to sell. It was simply a matter of PowerX, if it had a deal to make, coming to finding a deal, the power was there if PowerX wanted to sell it. Do you view commercial activity and sovereign activity as mutually exclusive categories? Not at all. Okay, so one of the theories of the Foreign Sovereign Immunities Act may be that a sovereign can engage in commercial activity. Exactly. In fact, in the House report, they specifically designate trading companies as one example of an instrumentality of authority. Well, that's why when you tell me that B.C. is involved in sovereign decision-making, that doesn't quite answer for me the question whether it's also engaged in commercial activity. I understand that, Your Honor. I think that the distinction between commercial activity in B.C. having a direct effect in the United States that would give jurisdiction over B.C. Hydro is the issue. Here we certainly have no direct effects because B.C. Hydro sets these limits, and it's up to PowerX to comply with those limits or to work out a deal with a customer so that it can make a sale within the policy limits set by B.C. Hydro. Let me ask you a question that Ms. Cregan, I think, was arguing earlier, and that is suppose that the evidence shows that B.C. Hydro deliberately withheld production, in other words, ordered its dams not to produce or spill as much water until the market price got to the point that it then ordered the dams to increase their production so they could take advantage of the situation in California. Would your position be that that decision is still a sovereign function by B.C. Hydro, even though it had a clear profit motive? Yes, Your Honor. It would be that the State is entitled to control its resources and to manage them as it sees fit, and that is a sovereign function that should not be second-guessed. Even if it has a commercial motive underlying it? It may well. The export controls that a nation imposes are very often have a commercial purpose of protecting and increasing the value of the nation's resources, and those are appropriate decisions for a sovereign to make, and those should not be second-guessed in a court. My time is up. May it please the Court, Alisa Klein for the Federal Agencies. As the district court held, there is no statutory waiver of sovereign immunity here that could allow Duke and Reliant's state law damages claims to go forward against the Federal Agencies. As the colloquy reflects, Duke and Reliant are relying on the general power to enter into contracts and settle claims, but that's never been thought to be a waiver of sovereign immunity. I mean, even in Flamingo, the Postal Service had the same powers to enter contracts and settle claims. Well, binding arbitration is in a sense a waiver, isn't it? Well, let me – I'm glad Your Honor brought up TANASCA, because actually the case – they're standing the case on its head. There, what you had were breach of contract claims predicated on BPA's actions brought against the United States under the Tucker Act. No question that there was a waiver of immunity for the Tucker Act claims. And then there was just an agreement to settle through arbitration, and what the TANASCA court says and the OLC memo and the Justice Department said is, yes, there's a power to enter into binding arbitration. That's not precluded by the Appointments Clause. We all agree there's a statutory waiver of sovereign immunity. We're just arguing about what it covers. Well, in a sense, that's right. There are various ways that the United States can be sued based on the conduct of BPA and WACA, under the Tucker Act for damages in the court of Federal claims, under the FTCA for tort-based claims. It's just that they really – they can't be sued like this directly under State law for – in State court. I mean, there's no waiver, the scope of which would encompass these types of claims. And just turning briefly to the issue on which we're an appellant, the district court recognized that the agencies were immune, but then misread the remand statute and thought it was compelled to remand the claims against us back to the very State court that it had determined had no jurisdiction. And as this Court's decision in Nebraska v. Benson makes clear, if there's removal jurisdiction and there's no dispute, there's 1442A, removal jurisdiction here, then that part of 1447C is not implicated. Then the district court adjudicates the claims and says, okay, I see they're barred by sovereign immunity, and then the remedy is to dismiss, not to remand back to State court, which really would make nonsense of the whole removal procedure. Assuming that you're correct, of course, that BPA, let's say, can remove. Yes. That brings the whole case here to district court. That's correct. Does that mean district court has jurisdiction then to make all of the rulings it made? Once – so there was removal jurisdiction, then the Federal claims are dismissed. You know, I have to admit I haven't thought through whether remand is permissive or mandatory under those circumstances, and I'm hesitant to opine, but I understand the question. Sorry to be somewhat unhelpful on it. And, you know, again, as we said in our brief, our argument that the case should have been dismissed, not remanded, is properly before this Court because it goes to the district court's power under the remand statute to remand as opposed to its underlying immunity determination. We're not, of course, quarreling with it because we agree with it. Unless the Court has questions, I will cede the remainder of my time. Okay. I'm sorry. The timing is quite confusing this morning with so many parties. May it please the Court, my name is Barry Himmelstein. I'll be arguing for the plaintiffs' people at Al. There are quite a few named plaintiffs in this case. I'd like to talk about something none of my colleagues want to talk about, but the panel seems to have some interest in, and that's the question of appellate jurisdiction. We've been litigating jurisdictional issues in this case for three and a half years. That's not supposed to happen. Congress put a statutory scheme in place to prevent that from happening. For that reason, removals must be made, if at all, within 30 days after the grounds for removal arise. District courts are supposed to address challenges to removal jurisdiction before reaching any other issues, and that happened here. And the courts of appeal are ousted of jurisdiction to review a district court's finding that it is without subject matter As this Court has said on repeated occasions, that rule holds even if the district court's ruling was, quote, clearly wrong, unquote. I'm not suggesting Judge Whaley was wrong in this case, but just as Judge Whaley addressed the question of his jurisdiction before getting to other issues, this Court must do the same. What do you do with it? I mean, it seems to me that your argument is perfect until you get to the right of removal of either federal agencies or foreign sovereigns. Doesn't that get it into district court in such a way that the district court is no longer denying removal on the ground of absence of subject matter jurisdiction because there's somebody who's entitled to bring the whole case into the district court? No. One has to, let me break that down if I can, because it's an important point. That's the biggest problem for me. With respect to removal by Power-X and B.C. Hydro, this Court has held repeatedly, and it's stated specifically in Security Pacific and Budget Rent-A-Car, that federal jurisdiction does not attach unless and until the district court finds, one, the removing party is a foreign sovereign under the Foreign Sovereign Immunities Act, and two, that no exception to sovereign immunity applies. Unless and until both of these things are true as to at least one removing party under the Foreign Sovereign Immunities Act, federal jurisdiction never attaches, and the only jurisdiction the district court has at that point is jurisdiction to determine whether it has jurisdiction. This Court has said expressly that in Security Pacific, after removal under the Foreign Sovereign Immunities Act, when a district court finds that a foreign sovereign is immune, Section 1447C mandates remand for lack of jurisdiction. So it may have been proper for B.C. Hydro to remove because no one disputes it was a foreign sovereign, but the case has to be remanded under Security Pacific. It's on point. of a dismissal order by the Superior Court on the grounds that it has no jurisdiction over a sovereign? Doesn't that turn the FSIA on its head? Well, Your Honor, it might have been smart for Congress to make statutory exceptions under 1447D in the case of the FSIA. They did not do that, and I respectfully submit it is not for this Court to do. There's a lot of things this Court can do. it lies in federal district courts? Yes. All right. And so what's wrong with a federal district court saying what I have before me, B.C. Hydro, is the entity of a foreign sovereign, and therefore I am ordering that entity dismissed? That question is clearly not before this Court because B.C. Hydro elected not to appeal from the district court's decision not to dismiss it from this case. B.C. Hydro asked for that. The Court said no. B.C. Hydro could have appealed. It did not. So there may be a case where the Court has to wrestle with that issue. This is not that case. Okay, but then we wrestle with BPA and WAPA. Yes. Again, we have to go to the doctrine of derivative jurisdiction to answer this question, which expressly in their brief, Duke and Reliant, the only parties appealing the determination as to BPA and WAPA, have expressly said is not before the Court. Is sovereign immunity of BPA an affirmative defense? It can be a defense on the merits, but in this case because of the way the case got to the district court, it is also a jurisdictional defect because under the doctrine of derivative jurisdiction, which has continuing vitality only in cases of removal by the federal government, where the state court has no jurisdiction over claims against the federal government, the district court acquires none upon removal. That is the doctrine. It's not an application of the doctrine. That's it. And Judge Whaley properly applied that here. Once you determine, as Judge Whaley correctly did, that BPA and WAPA did not waive sovereign immunity, the suit filed against them in district court, the state court had no jurisdiction of, and upon removal, Judge Whaley had no jurisdiction under the derivative jurisdiction doctrine. Well, I guess I don't understand how you apply 1442A, which gives them, it's a federal statute that gives them the right to remove. They have the right to remove, and they removed it, but the district court did not have jurisdiction. It is odd, and it's analogous to what happened with the purpose of that. If they have, let us say that there is a waiver of jurisdiction. Isn't that purpose of that to give them a federal form to make the determinations in the case? Well, when Your Honor says a waiver of jurisdiction, you mean assume for the sake of argument that they've waived sovereign immunity. Well, if they had waived sovereign immunity, we wouldn't be here appealing, discussing the remand order, because the court would have jurisdiction over the action. But Your Honor, you're asking me to make. We have a determination of immunity. Yes. And you're saying, what, they were not entitled to that in federal court? They got that determination as part of jurisdictional findings. Now, could Judge Whaley have reached out and dismissed the claims against BPA and WAPA on the merits? I'd like to be able to say no, but in light of the precedent of this court, I can't. He could have done that. He did not do that. What he did, I submit, was equally a valid exercise of jurisdiction to remand the action back to state court. May not have understood that he had discretion to do that. You're arguing he did have discretion, but I don't. What he said doesn't make me think he thought he had discretion. Maybe we would need to remand for an exercise of discretion. Oh, Your Honor, we've been at this three and a half years already, just on jurisdiction. And I'm sure there would be an ensuing appeal. So where are you taking us now? You're taking us back to state court. Yes, Your Honor. For what? For what? Well, as far as we're concerned, for us to litigate our case against the people we brought our case against, as far as ‑‑ Including foreign sovereigns. Excuse me? Including foreign sovereigns and federal agencies. There are cross-claims against the foreign sovereigns. I fully expect that the superior court will dismiss those claims. You don't care. You didn't sue them. Exactly. That's true. But, you know, in the Hansen versus ‑‑ in the Blue Cross, Hansen versus Blue Cross, and again in a more recent decision of Beda, which this Court cited in vacating its order to show cause, this Court said, you know, there may be collateral estoppel implications of a ruling in state court. There may not. It doesn't matter. Our hands are tied. We just don't have jurisdiction to review the order. And there are perhaps situations where the law is not a perfect seamless web, as everyone would like it to be, and perhaps Congress should fix that. But I respectfully submit that when it comes to jurisdiction and appellate jurisdiction, this Court cannot expand its jurisdiction on public policy grounds. It may suggest to Congress that it do something, but jurisdiction is confined by statute. Don't we still have the authority to, in essence, send this back to the district court and point out that perhaps it ought to reconsider its decision with regard to the immunity of these entities? What would be wrong with doing that? Are you speaking of BPA and WAPA or also? Then it might just dismiss it and you would have a collateral appealable order if it preceded the order of remand, which it did not. I mean, you have to play it where it lies. The judge issued a remand order under the Waco Doctrine. If he had dismissed the claims against the United States and D.C. Hydro before entering that remand order, the Supreme Court says it must precede the remand order both in logic and in fact. Then it is reviewable under the Waco Doctrine. That did not happen here. The judge issued a remand order, which is nonreviewable, And I respectfully submit if this Court does anything with that order besides dismiss this appeal for want of jurisdiction, it is meddling where Congress has told it it may not meddle. For suggesting to the district court that you might have got it wrong on the jurisdictional analysis with regard or actually on the merits of whether or not these entities are amenable to suit in state court. I think a suggestion from this Court would be perceived more as an order than a suggestion. We can write it in a nice way. I really respectfully must disagree. The law does not always provide a perfect solution for everything. That's why Congress goes and fixes problems. You may have a problem here. It may be wise to have a congressional solution, but I don't think it is for this Court to invent one. Well, is it then really your position that states can or are free to sue Federal agencies in state court, and that that is, as a matter of law, the proper form? You don't want us to reach that, I take it. No, and I don't think the State did not sue the Federal Government here. I don't, well. The defendant's did. And lawyers should read jurisdictional statutes before they file cases. They should have known they couldn't sue the Federal Government in state court. If they wanted to sue it, they should have brought this claim. Practical result. Are you really arguing that for a practical result that makes it possible for states to sue Federal agencies in Federal government, in Federal, in state court, and if there's a removal, there's no way for an appellate court to enforce the statute giving the Federal agency the right to remove? Is that really where we are? Giving the Federal agency the right to remove. Well, always this can come up through the chain of certiorari, which is sort of the parachute of last resort. Oh, you could seek a writ. Yes. Got it. So there is an ultimate Federal veto, right, a veto on that. If any state should be arrogant enough to do that, you know, it will not reach final enforceable judgment. This doesn't seem to happen very often. This is the only case, you know, that I'm aware of right now where this is an issue. Most of the time. The proposition, the result of the proposition you're urging is that a state can entertain a case against a Federal agency if the agency is immune from suit. No. If it's not immune from suit, it has a right of removal. Just like in the Rooker, I think it's the Rooker-Feldman doctrine application, state courts are competent to decide questions of Federal constitutional law. I think the court should not presume that a state court judge would be so, pardon the expression, ignorant and arrogant to say, to thumb its nose at the Federal government and all these statutes and hold it in for trial and just wait for the jury. We must presume some competence with the brethren on the state court bench. So if these, okay. So if the state does sue it, never mind. But ultimately, if I may, you know, the ultimate result of this would not change the issues I'm concerned with. If Judge Whaley had dismissed the United States, that wouldn't change the fact that the renand order is nonreviewable. If he had entered that separate order, Waco says that. And so this is really of not great concern to me unless the panel does what I've heard suggested, which is send it back for another two years of litigation. That would greatly concern me, because we've been at this three and a half years when we should have been at it 90 days on jurisdiction. Well, assuming that you have a right to bring these claims at all. I mean, we have parallel proceedings ongoing before the commission to alleviate some of the harm that you're complaining about. It's not as if the rate payers of California and your clients are completely without remedy. Well, again, Your Honor, I don't think you're allowed to decide your jurisdiction based on considerations of public policy. I respectfully submit that is what Congress does when it prescribes appellate jurisdiction. It makes the balancing test of whether to prefer accuracy in levels of review versus speed. And as this court has repeatedly said, and I'll just quote from, you know, from Pelleport, that Congress decided that in cases begun in state court, lengthy delays occasioned by federal appeals over jurisdictional issues are unacceptable. Consequently, the district court is the final arbiter of whether it has jurisdiction to hear the case. Judge Whaley decided he did not, and that should be the end of the matter. Okay. Thank you. Where are we on time? Go ahead. Since we're adverse to plaintiffs on appellate jurisdiction, I know, we try to split it up. But basically, I just want to make clear, we're not writing on a blank slate here. And it's all going back and forth on that side of the room. Exactly, right. We didn't even know where to sit. But, I mean, basically, even though 1447D, which seems to preclude appellate review of remand orders, looks broad on its face, the Supreme Court said back in Thurmtrom, you know, 1970s, wait, you have to, you know, read that in context, particularly in light of 1447C. And this Court, and we cite the case, the California District Council of Laborers case, made clear that if what you're talking about is a question of the power to remand, the general question, that that's reviewable in this Court. And actually, I think the only hard question is, is it technically a writ of mandamus or appellate jurisdiction? But it's absolutely before this Court. You know, just as when the question was the defect in removal was raised more than 30 days after the removal. So are you, in effect, asking us to construe your cross-appeal as a petition? We did say that on a reply brief, because we couldn't tell from this Court's precedence, but, yes. Absolutely. If that's the proper way to proceed, that's what we're asking for. Thank you. This will be the last serve. The root of the problem may be that Judge Whaley, as I believe Your Honor pointed out, did not dismiss either the Federal entities, nor did he dismiss the Canadian entities. Had he dismissed the Federal entities, we would be here properly on our side on appeal under Section 1291 of the Judicial Code. That is the holding in your decision in Galea. That is the holding in your decision a decade later in Nebraska v. Benson. It cannot be the law that because Judge Whaley believed that he could not, and I believe Your Honor is correct, he decided he could not, not that he would not, actually dismiss, that we have to take to State court and then go through the State court appellate system, as would be the result from Mr. Himmelstein's suggestion of an appeal with Ms. Klein to come to Sacramento or, if we make it to the Supreme Court, or with Mr. Smith. Rather, what's happened here is Judge Whaley has made the decision that the Federal entities and the Canadian entities, to the extent that we would have claims against them, Duke and Reliant, those claims are out. And that is why we have jurisdiction to, or you have jurisdiction to hear our appeal under Section 1291. And I thank the Court for being understanding of how we bounce back and forth. Thank you. Is that it? Okay. The Court very much appreciates the quality of the preparation that went into this case, and the case is ordered, submitted. Thank you. We'll go to the next case, which is... Snohomish. People... Which is next? Yeah. People from TransCanada.  I guess it's TransCanada. What happened to Snohomish?
judges: Schroeder, Canby Tallman